*In re* Kr. K. *et al.,* Minors (The People of the State of Illinois, Petitioner-Appellee, v. K.K., Respondent-Appellant).

Second District    No. 2—93—0035

Opinion filed February 1, 1994.—Modified on denial of rehearing March 30, 1994.

Robert E. Burke, of McHenry, and Zachary M. Bravos, of Law Offices of Zachary M. Bravos, of Wheaton, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE BOWMAN delivered the opinion of the court:

This case involves findings and judgments on a juvenile court petition containing two counts alleging abuse under the Juvenile Court Act of 1987 (Act) (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(2)(iii) (now 705 ILCS 405/2—3(2)(iii) (West 1992))) and neglect under the Act (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(1)(b) (now 705 ILCS 405/2—3(1)(b) (West 1992))) by respondent father against his two children, Kr. K., female minor, and Ke. K., male minor. An adjudicatory hearing was held with testimony from numerous witnesses. The trial court ruled that the State had proven abuse and neglect of Kr. K. and Ke. K. The trial court entered an order making the minors wards of the court, prohibiting contact with the minors by respondent unless or until it is determined to be appropriate and necessary by the minors' therapist, requiring respondent to be financially responsible for the

minors' treatment, and determining that custody and guardianship should remain with the wife. In addition, the order stated that the wife should insure that the minors continue to receive treatment and that respondent and the wife cooperate with the Department of Children and Family Services (DCFS) and follow all recommendations with the ultimate issue of financial responsibility for the minors' treatment to be resolved in the pending divorce case. Respondent timely filed a notice of appeal. On appeal, respondent contends that (1) the judgment of the trial court was against the manifest weight of the evidence; and (2) respondent was denied the effective assistance of counsel.

Respondent and his wife were married on June 30, 1984. They are the parents of two minor children, Kr. K. born June 12, 1986, and Ke. K. born December 16, 1988. The couple was separated in spring of 1991.

The events that led to the filing of the Juvenile Court Act petition are as follows: The wife testified that on or about October 18, 1991, she had a conversation with Kr. K. in her truck while moving out of the family home. The wife asked Kr. K., "Does Daddy ever hug you?" Kr. K. responded, "Yeah, my daddy hugs me." The wife then asked, "Does Daddy ever touch you?" and Kr. K. responded "Yeah." The wife then asked "Well, where does Daddy touch you?" and Kr. K. pointed to her head, tummy, toes, vaginal area, and her back area. The wife said, "Well, [Kr. K.], Daddy doesn't touch you there," and Kr. K. responded that he did and nodded her head.

On October 23, 1991, the wife brought Kr. K. in for examination for possible sexual abuse by respondent. Kr. K. was examined by Dr. Richard Rosenfeld, a licensed medical doctor, who was not a pediatric gynecologist. Kr. K. was examined from head to toe with special attention to the genital and rectal areas and no evidence of any trauma was found. Vaginal and urine specimens were taken which were negative for sperm. The examining doctor noticed nothing unusual about the vaginal area. Dr. Rosenfeld pointed to Kr. K.'s vaginal area and asked her if anybody had touched her "down there," and Kr. K. denied any such touching. He also asked her if her daddy had been rough with her in any way, and she denied that also. The doctor then discussed the results with the wife, who was very insistent that an abuse had occurred and was rather unhappy with the examining doctor's negative findings. No specific examination of the hymen was done. Dr. Rosenfeld then called in a social worker, Naomi Renfro, for another opinion.

Ms. Renfro testified that she is a licensed clinical social worker and interviewed Kr. K. on October 23, 1991, with the wife present.

Kr. K. answered her questions by nodding and when asked if her daddy touched her she shook her head to indicate "no." After discussing the results of the physical examination with the wife, DCFS was contacted by Ms. Renfro. It was the wife's idea to contact DCFS, and Ms. Renfro would not have done so nor did she feel the law or any guidelines required such a report. Ms. Renfro testified that there was nothing to indicate that Kr. K. was abused by her father. When Ms. Renfro asked why the wife felt that respondent had abused the children, she indicated that the child, a couple of days prior, indicated to wife that respondent had touched her in the vaginal and rectal areas.

On October 24, 1991, Kr. K. was interviewed by George Hollow, a child protective investigator for DCFS, at her maternal grandparents' house in the presence of the wife and Ke. K. Although the session lasted 15 to 20 minutes, Mr. Hollow could not do an interview because of Kr. K.'s hyperactivity. When questioned about what happened between her and her father, she would not respond. Then she reacted by getting very active in her room and getting and bringing back dolls to Mr. Hollow. Mr. Hollow talked to Kr. K. about sexual abuse and her daddy touching her.

On October 29, 1991, Mr. Hollow met again with Kr. K. at her grandmother's house. Kr. K. was again hyperactive and the wife was asked to join them. Kr. K. said that while she was at her paternal grandparents' house the grandparents had gone out to dinner and while she was alone with her father and brother, her father made her straddle him while he lay on the floor on his back. He then made Kr. K. pull her pants and panties down, and he took his finger and put it in the place she goes "pee." She pointed to her vagina and said it hurt when he did this. Kr. K. said that the next time her father did that to her she was going to tell him to stop because it hurt.

On November 14, 1991, Mr. Hollow again met with Kr. K. at her maternal grandparents' house. Mr. Hollow, Kr. K., and the wife were all present. At this meeting Kr. K. said that abuse also happened in her home when her mother would go to play practice. The two minors would be left alone with respondent and respondent would put his finger in the place where Kr. K. goes "pee." Mr. Hollow asked Kr. K. about her brother. She did not seem to be sure at first, but then she talked about her brother being alone with his father also.

On November 18, 1991, Mr. Hollow met a fourth time with Kr. K. and Detective O'Donnell from the Illinois State Police. Kr. K. would not talk with Detective O'Donnell. Mr. Hollow indicated that Kr. K. knew the difference between the truth and a lie by some of the questions he asked. Mr. Hollow concluded in his capacity as an

investigator for DCFS that the report on this case "indicated" sexual abuse and molestation.

Detective O'Donnell testified that he was present at an interview of Kr. K. in November 1991 during which most of the interview was done by Mr. Hollow. This interview lasted 45 minutes to one hour and initially Kr. K. did not indicate she was abused by her father. Later in the interview Kr. K. did say that her father did something to her. The child's response was to a question asked by her mother which was either "[t]ell the man where Daddy touched your pee-pee" or "[s]how that man where Daddy touched your pee-pee."

On November 7, 1991, Kr. K. met with Michelle Fitzpatrick, a certified domestic violence counselor who works with children who are victims of domestic violence, sexual abuse, and such issues. Ms. Fitzpatrick has a bachelor's degree in psychology obtained in May 1991 and at the time of the hearing had been doing such counselling for 1½ years. Her contact with Kr. K. was in a group meeting of preschoolers three to six years old and on November 7, 1991, there were about five children in the group. The activity planned for November 7, 1991, was sexual abuse prevention, and Michelle reviewed with the children good touches and bad touches from a story called *It's My Body*. They talked about private areas and types of good touches and bad touches. Ms. Fitzpatrick then asked if anyone had ever received good touches or bad touches. Kr. K. was the only child to speak. She said, "Yes, I have had a bad touch." Ms. Fitzpatrick asked who had given her a bad touch, and Kr. K. responded, "My Daddy." When asked, "What kind of bad touch was it?" she responded "My Daddy asked me to show him my pee." When asked what she meant by that she pointed to her vagina. Ms. Fitzpatrick had two other meetings with Kr. K., and respondent was not mentioned in either of those meetings.

On November 14, 1991, Rebecca Bier, a licensed clinical social worker, commenced treating Kr. K. At the time of the adjudicatory hearing she had had 32 sessions of 45 minutes each with Kr. K. in therapy. At the beginning of the treatment, Kr. K. was anxious, had temper tantrums on a daily basis, was withdrawn, isolated, unable to focus or concentrate. In addition, Kr. K. made no statements about any touching to Ms. Bier until December 3, 1991. Ms. Bier testified that Kr. K. talked to her about inappropriate touching and licking by respondent on numerous occasions and described two sessions in which such discussions took place. The first took place January 25, 1992, and the second took place on April 14, 1992. Ms. Bier expressed an opinion that Kr. K. was suffering from post-traumatic stress disorder. That disorder is diagnosed when there has been an experience

outside the realm of normal that is markedly distressing. In her opinion Kr. K. had been traumatized and displayed hypervigilance, difficulty in concentration, head banging, hair pulling, nightmares, and rage over minor incidents. She based her assessment on talking to the wife, maternal grandmother, and the kindergarten teacher.

On January 25, 1992, Ms. Bier testified that she and Kr. K. had had a conversation in which the minor indicated that "Daddy touched me. Dummy Daddy. 'You're a bad girl,' said Daddy, and to [Ke. K.] too. I was first, and [Ke. K.] was last. Daddy was touching me and he shouldn't. Sometimes I get excited for my dad. No, but my dad touched me, and that's why. I get excited for my dad." She also indicated her vagina and her behind, in response to the question "Where did he touch you?" The minor further stated that "[Ke. K.] only gets two touches. I get five touches, sometimes six touches, maybe I get seven touches. Grandpa didn't touch me, not Grammy, not [Ke. K.], not Mama. Maybe God will give Daddy new brains. Daddy was a bad Daddy, and he needs new brains. I wasn't a liar; my dad thinks I was, but I wasn't. Daddy was a bad daddy. Daddy did the same thing like [Ke. K.]. Daddy did the same thing like he did to me, but it was a different kind, almost the same kind." Such statements were elicited during "play" therapy.

On January 27, 1992, Kr. K. was examined by Dr. Ramona Iris Slupik, who testified that she is a licensed gynecologist. The wife was referred to Dr. Slupik by Mr. Hollow and Ms. Bier. Dr. Slupik took a history from the wife regarding what Kr. K. told her and then did an examination of Kr. K. involving the external genitalia and hymen. The history taken by Dr. Slupik from the wife was that Kr. K. told her that the respondent had been putting his finger up where she goes "pee-pee," that he had tied her hands and legs up and blindfolded her and pulled her pants down and touched her. Dr. Slupik made no attempt to confirm any of the history taken from the wife independently.

During the external examination Dr. Slupik found some thickening of the hymen posteriorly, which means along the bottom edge of the hymen, as well as some neovascularization, which Dr. Slupik indicated meant the growth of new blood vessels in the area of prior trauma. Dr. Slupik's diagnosis was that her findings were consistent with a history of sexual abuse, although the damage she observed may be attributed to something other than sexual abuse. In her opinion, the damage she observed was consistent with the insertion of someone's finger and the thickening of the hymen she observed is a form of scarring. In Dr. Slupik's opinion Kr. K. was psychologically orientated, did not appear to be hallucinating, understood and

responded to the doctor's questions, and did not appear to be rehearsed. In her opinion, the only explanation for the hymenal indication would be the insertion of some foreign object.

On October 14, 1992, respondent filed a motion for an independent physical examination. Dr. Andrea Newman, a licensed pediatrician practicing for five years, examined Kr. K. on October 21, 1992. Dr. Newman found the minor's rectal exam to be normal, but on examination of the vagina she made a significant finding that the minor had a very irregular opening. Specifically, at the nine o'clock, six o'clock, and two o'clock positions there was a loss of the hymenal membrane and her hymenal opening was larger than it typically is for children of her age. While the larger than normal hymenal opening is not specific for vaginal penetration, the loss of membrane *is* diagnostic for vaginal penetration. The minor's damage to the hymen could have been caused by any kind of penetration including insertion by a physician's finger or someone else's finger in a rough sort of way. In Dr. Newman's opinion the injury she observed would not normally be from masturbation but it is possible that a child could cause this kind of injury with an instrument or a child's toy. It would be extremely painful. In Dr. Newman's opinion, a child would not intentionally cause this harm to herself. Dr. Newman testified that there had been no fresh injury within the past few weeks. It could have been two months old, six months old, eight months, or as much as a year old. Dr. Newman also indicated that it was more likely than not that the damage she saw was the same thing that Dr. Slupik saw six months previously.

On December 14, 1991, respondent commenced visitation with his children supervised by the Reverend B.J. Jones. On December 21, 1991, during a visit between respondent and his children supervised by Reverend Jones, Kr. K. was playing with her dad and came over, climbed on Reverend Jones' lap and said "Daddy didn't touch me. I know that." The only time that Reverend Jones left the room in which respondent was with the children was on the first visit on December 14, 1991, to change Ke. K.'s diaper. Each visit was two hours long. Reverend Jones signed an affidavit which indicated that Kr. K.'s statement appeared to be coached by respondent, was not in context, and respondent appeared to be elated at the statement as if he received some kind of victory.

On May 13, 1992, Detective Al Steffen, a detective with the City of Prospect Heights for almost three years, met with Kr. K. at the maternal grandparents' home. Kr. K. said that her daddy did a bad thing to her that happened while she was at her father's home in Prospect Heights. She stated that her daddy had asked her to stand

over him and he inserted his finger into her "pee," which she indicated was her vagina by pointing between her legs. She also said that after that her father made her hold the camera while he touched her brother's "butt." Detective Steffen described Kr. K. as being very, very active, very hyper, and wanting to change the conversation. She seemed to want to play and did not want to sit and talk about the incident. During his investigation, Detective Steffen conducted searches of respondent's workplace, vehicle, and briefcase with negative results.

Kr. K. testified that she does not know the difference between a good touch and a bad touch. She said that her dad touched her and made her feel bad at her Dad's mom's house. She said the touch hurt. When asked where she was touched she pointed to her rectal and vaginal area and indicated he touched her with his finger. She related that it happened more than one time. She indicated that her Dad did the exact same thing to her brother as he did to her, but that she only saw it once.

Respondent testified and categorically denied ever abusing his daughter in any way physically or sexually. Troy Westermeyer, a friend of both the wife and respondent, testified that both in June 1991, and in the past, both the wife and respondent expressed concern about the wife's brother, Steve, watching the children. The wife said that the concern was due to fondling of the child which they saw in 1989 at the maternal grandparents' house. Patricia Westermeyer also testified that in June 1991 the wife expressed to her that she was not comfortable with her brother baby-sitting the children because in the past there was an incident whereby the brother was found caressing Kr. K. Two other persons also testified that both the wife and respondent discussed with them an incident in which they discovered Steve alone with Kr. K. and caressing her in a strange way.

Starting in February 1992, visits between respondent and the minors were supervised by Durie Bennett, a psychotherapist. She supervised 13 visits from February 1992 through May 1992, which were one hour each, once per week. During those sessions the children interacted with respondent positively, were jubilant, very excited, very loving, talkative and hugging. A couple of times in February 1992, while Ms. Bennett was supervising visits, Kr. K. spontaneously said, "You didn't touch me, Daddy." In addition, in April 1992, Kr. K. said "You aren't going to be my daddy, I'm going to get a new daddy." Respondent did not have an opportunity to speak to Kr. K. alone during her supervised visits, nor could respondent have a conversation with Kr. K. which Ms. Bennett could not overhear.

The first issue on appeal is the sufficiency of the evidence to support a finding that respondent sexually abused and neglected his daughter, Kr. K., and neglected his son, Ke. K. On appeal, the trial court findings will not be disturbed unless they are contrary to the manifest weight of the evidence. (*In re J.H.* (1987), 153 Ill. App. 3d 616, 630.) The definition of a neglected minor provides, in pertinent part, "any minor under 18 years of age whose environment is injurious to his or her welfare." (Ill. Rev. Stat. 1989, ch. 37, par. 802—3(1)(b) (now 705 ILCS 405/2—3(1)(b) (West 1992)).) The definition of an abused minor provides, in pertinent part:

> "(2) Those who are abused include any minor under 18 years of age whose parent or immediate family member, or any person responsible for the minor's welfare, \*\*\*
>
> \* \* \*
>
> (iii) commits or allows to be committed any sex offense against such minor, as such sex offenses are defined in the Criminal Code of 1961, as amended, and extending those definitions of sex offenses to include minors under 18 years of age." Ill. Rev. Stat. 1989, ch. 37, par. 802—3(2) (now 705 ILCS 405/2—3(2) (West 1992)).

■ Respondent contends that because Kr. K. was first questioned by her mother, and the accusations arose in the context of a separation, divorce, and custody dispute, the evidence does not support a finding that respondent sexually abused his daughter. On the basis of the facts set forth in this disposition, we determine that a finding of sexual abuse and neglect with respect to Kr. K. is not against the manifest weight of the evidence. The physical evidence revealed by two medical exams supports a finding of sexual abuse of Kr. K. Furthermore, the testimonial evidence of numerous persons who interviewed the little girl supports a finding of neglect and sexual abuse of Kr. K. Although there is some conflicting testimony, the resolution of conflicting testimony is to be determined by the trier of fact and in a bench trial the judge's findings of fact are to be afforded the same deference as those of a jury. (*Watkins v. Martin* (1983), 115 Ill. App. 3d 417, 422.) Furthermore, under section 2—18(3) of the Act (Ill. Rev. Stat. 1989, ch. 37, par. 802—18(3) (now 705 ILCS 405/2—18(3) (West 1992))), the proof of the abuse or neglect of Kr. K. shall be admissible evidence on the issue of the neglect of Ke. K. (Ill. Rev. Stat. 1989, ch. 37, par. 802—18(3) (now 705 ILCS 405/2—18(3) (West 1992)).) Thus, sufficient evidence was presented to prove the abuse and neglect of Kr. K., and under section 2—18(3), this satisfies the proof of neglect of Ke. K.

Respondent next contends that he did not receive the effective assistance of counsel at trial. He asserts that the constitutional stan-

dard set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, for ineffective assistance of counsel applies in an abuse and neglect case under the Act (Ill. Rev. Stat. 1989, ch. 37, par. 801—1 *et seq.* (now 705 ILCS 405/1—1 *et seq.* (West 1992))), since the United States constitutional right to counsel has been held applicable in juvenile proceedings. The State, on the other hand, asserts that *Strickland* applies to criminal or quasi-criminal cases, where a liberty interest is at stake. The State asserts that no liberty interest is at stake in this abuse and neglect case; hence, the *Strickland* constitutional requirement of the effective assistance of counsel does not apply.

The right of counsel in juvenile proceedings flows from the fourteenth amendment to the United States Constitution, as well as from State statutes. In Illinois, at issue may be either a juvenile's right to counsel in a proceeding by which a determination of "delinquency" is made (*In re Application of Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428; U.S. Const., amend. XIV) or the juvenile's right and the parent's right to counsel in proceedings under the Act (Ill. Rev. Stat. 1989, ch. 37, par. 801—5 (now 705 ILCS 405/1—5 (West 1992)); *In re T.H.* (1986), 148 Ill. App. 3d 877, 883).

At issue in triggering the right to counsel is whether a litigant's interest in personal liberty is at stake, that is, where there is a greater chance of interfering with a litigant's liberty interest, a greater need arises for the right to counsel. (*Lassiter v. Department of Social Services* (1981), 452 U.S. 18, 26, 28 n.3, 68 L. Ed. 2d 640, 649, 650 n.3, 101 S. Ct. 2153, 2159, 2160 n.3; U.S. Const., amends. VI, XIV.) Such a liberty interest is believed to be present in parental rights termination cases, where "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one." (*Lassiter*, 452 U.S. at 27, 68 L. Ed. 2d at 650, 101 S. Ct. at 2160.) In *Lassiter,* the Court found that both the sixth amendment and fourteenth amendment rights to counsel applied. *Lassiter*, 452 U.S. at 26, 28 n.3, 68 L. Ed. 2d at 640, 650 n.3, 101 S. Ct. at 2153, 2160 n.3; U.S. Const., amends. VI, XIV.

*In re R.G.* (1988), 165 Ill. App. 3d 112, was a termination of parental rights case. The court determined that in that context not only is there a right to counsel under the Act (Ill. Rev. Stat. 1989, ch. 37, par. 801—5(1) (now 705 ILCS 405/1—5(1) (West 1992))), but there is a right to effective counsel under *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052. (*In re R.G.*, 165 Ill. App. 3d at 127.) The Appellate Court, Second District, in *In re R.G.* found that the sixth amendment right to counsel as set forth in *Strickland* applies in parental termination cases on the basis that

other jurisdictions have so found. We also note that in *Lassiter,* in footnote 3, the sixth amendment was determined to apply to parental rights termination cases in which a parent may be accused of alleged criminal activity.

■ The present case is one of charges of abuse and neglect, and it is in such a context that defendant asserts that not only does he have a statutory right to counsel but he has a constitutional right to effective counsel. We agree for several reasons. First, one effect of an abuse and neglect adjudication may be a separation of the parent from the child. In addition, we note that it is important to observe that Illinois abuse and neglect cases often serve as the predecessors for proceedings to terminate parental rights. (*In re Smith* (1981), 95 Ill. App. 3d 373.) Additionally, the evidence presented in an abuse and neglect determination may be used against the parent in a parental rights termination. (*Smith,* 95 Ill. App. 3d at 376-77.) Because *R.G.* set forth the *Strickland* standard for effective counsel for parental rights' terminations, and it is possible that this abuse and neglect may serve as a predecessor for a termination of parental rights, we determine that the *Strickland* standard should apply to abuse and neglect cases. Thus, defendant was entitled to an objective standard of reasonableness of counsel and the reasonable probability that the outcome of the trial would not have been different had there been the effective assistance of counsel. *Strickland,* 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

The standard set forth in *Strickland* and adopted by the Illinois Supreme Court in *People v. Albanese* (1984), 104 Ill. 2d 504, 526-27, is that the defendant must show that his counsel's representation fell below an objective standard of reasonableness and that there is a reasonable probability that the outcome of the trial would have been different had there not been ineffective assistance of counsel. (*Strickland,* 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064; *Albanese,* 104 Ill. 2d at 525.) Claims of ineffectiveness can be disposed of on the ground that the defendant suffered no prejudice from the claimed errors without deciding whether the errors were serious enough to constitute less than reasonably effective assistance. (*People v. Caballero* (1989), 126 Ill. 2d 248, 260.) We now analyze whether there is a reasonable probability that the result would have been different had there not been ineffective assistance of counsel.

■ Defendant argues that several of defense counsel's errors were prejudicial to his case and, on this basis, that he was denied the effective assistance of counsel. First, defendant asserts that his attorney failed properly to impeach the wife's testimony. At issue was whether the wife discussed the father's touching of Kr. K. with

Kr. K. before the little girl was interviewed by the DCFS investigator. While defense counsel might have perfected the impeachment of the wife by subpoenaing the court reporter to discuss the wife's deposition testimony, such impeachment would have gone to the wife's credibility, and perhaps to the DCFS investigator's testimony about Kr. K.'s account to him. In light of the other strong evidence in favor of the State, it is highly unlikely that the result of the trial would have been different had such impeachment been perfected.

Next, respondent asserts that respondent's trial counsel failed adequately to cross-examine Kr. K. Defense counsel's cross-examination was focused on Kr. K.'s growling and attempted to elicit a response that would provide an alternative explanation to sexual abuse for such behavior. On appeal, respondent asserts that the defense counsel improperly failed to ask Kr. K. about her relationship with her father or mother or her statements that "Daddy didn't touch me." Such a strategy may have been a trial tactic so as not to antagonize the trier of fact by harshly cross-examining the young victim. In order effectively to criticize such conduct, respondent must overcome the presumption that the challenged action might be considered sound "trial strategy." (*Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) We determine that such a tactic could be considered a sound trial strategy. In addition, in light of the overwhelming evidence in this case, we determine that such failure to cross-examine the minor victim was inconsequential and would not have changed the outcome of the trial.

Respondent next contends that respondent's counsel brought out testimony that would serve to prejudice respondent in the eyes of the trier of fact. Specifically, respondent contends that his counsel interjected testimony that the wife believed that respondent tried to kill her, respondent sabotaged her belongings, and respondent injured her dog. The State contends that the rationale for bringing out such testimony was that it demonstrated the wife's unreliability as a witness and her seeming paranoia, thereby diminishing her credibility. We determine that such testimony could have been inferred by the trier of fact to discredit the wife's testimony and support the respondent's theory that she seemed to be paranoid of the respondent's actions. On that basis, we determine that the introduction of such testimony was a trial tactic on the part of respondent's attorney, and thus is presumed to be sound "trial strategy." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.

Respondent also argues that the facts that (1) the two medical examinations of Kr. K.'s vaginal area are in direct conflict with each other; (2) the examinations were performed nine months apart; (3) re-

spondent had no unsupervised visits with Kr. K. during those intervening months; and (4) respondent's attorney failed to point out this discrepancy to the jury were evidence of ineffective assistance of counsel. The first examination was January 27, 1992, when Kr. K. was examined by Dr. Ramona Iris Slupik. Dr. Slupik found some thickening of the hymen posteriorly, which means along the bottom edge of the hymen. The second examination was conducted by Dr. Andrea Newman on October 21, 1992. Dr. Newman found Kr. K.'s rectal exam to be normal but on vaginal exam made a significant finding that Kr. K. had a very irregular opening. First, the opening was larger than normal for children of her age. Second, at nine o'clock, six o'clock, and two o'clock there was a loss of the hymenal membrane. In those three locations there was no hymen at all; thus the hymen was triangularly shaped with a loss in those three areas.

We determine that respondent's argument that his counsel failed to apprehend the medical evidence is unwarranted. The two evaluations are not contradictory and both are consistent with sexual abuse or vaginal penetration. One doctor addressed hymenal tissue and the irregular opening and the other doctor found scar tissue. On this basis, we determine that respondent's counsel was not ineffective in not showing a discrepancy in the evidence. In conclusion, we determine that respondent's counsel was not ineffective.

For the foregoing reasons, we affirm the decision of the circuit court of Lake County.

Affirmed.

GEIGER and COLWELL, JJ., concur.