**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 230030-U

Order filed November 16, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| *In re* J.C., | ) | Appeal from the Circuit Court |
| | ) | of the 21st Judicial Circuit, |
| a Minor | ) | Iroquois County, Illinois, |
| | ) | |
| (The People of the State of Illinois, | ) | |
| | ) | |
| Petitioner-Appellee, | ) | Appeal No. 3-23-0030 |
| | ) | Circuit No. 16-JA-6 |
| v. | ) | |
| | ) | |
| Clarence C., | ) | Honorable |
| | ) | Michael C. Sabol, |
| Respondent-Appellant). | ) | Judge, Presiding. |

_____

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice Holdridge and Justice McDade concurred in the judgment.

_____

**ORDER**

¶ 1      *Held*: (1) Counsel was not ineffective for stipulating to respondent's unfitness. (2) The court's decision to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 2      Respondent, Clarence C., appeals from the termination of his parental rights arguing that (1) counsel was ineffective for stipulating to his unfitness, and (2) the Iroquois County circuit court erred in terminating his parental rights. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4          On September 22, 2016, the State filed a petition for adjudication of wardship under the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-13 (West 2016)) in which it alleged that J.C. (born June 2007) was a neglected minor. In support of that allegation, the State asserted (1) that J.C.'s environment was injurious to her health based on a history of illegal substance abuse by her mother, Crystal C.; (2) a lack of engagement in services to address the substance abuse; and (3) that J.C. was born with cocaine in her system. The court found J.C. to be neglected on November 7, 2016.

¶ 5          A dispositional report was filed on November 30, 2016, providing the history of the case. J.C. and Crystal had been previously involved with the Department of Children and Family Services (DCFS), and J.C. was returned to respondent because Crystal was actively using drugs at the time the case was closed in 2009. However, respondent was incarcerated in 2014 and left J.C. in the care of her maternal grandmother, Barbara T. Respondent was released from prison in January 2016, but struggled to secure housing and employment. Therefore, J.C. continued to live with Barbara. It was reported to DCFS that J.C. was moving in and out of Crystal's boyfriend's home, who had an extensive criminal history. Crystal gave birth to another child who tested positive for cocaine on September 20, 2016. Crystal was under the influence of illicit substances at the time of delivery.

¶ 6          The report further stated that respondent lacked candor with DCFS. Respondent appeared to believe that since he completed substance abuse treatment while he was incarcerated, he should be allowed custody of J.C. without having to complete any further services. DCFS recommended that Crystal and respondent be found unfit, unwilling, and unable to care for J.C., that DCFS be named guardian, and that both parents cooperate with the service plan.

¶ 7 On December 16, 2016, following a dispositional hearing, the court found respondent unfit based on his former use of illegal substances, his past DCFS involvement regarding his drug use, and that he was on parole for selling drugs. Respondent was ordered to comply with the terms of the service plan.

¶ 8 A permanency hearing report was filed on March 1, 2017, which indicated that respondent had participated in his integrated assessment. Respondent was referred for individual counseling in January 2017, but failed to return any calls from the counseling provider. At the March 23, 2017, permanency hearing, the court found that respondent continued to have issues obtaining housing and failed to follow up with individual counseling. The following service plan, filed on April 6, 2017, required respondent to (1) successfully complete a domestic violence perpetrator's course, (2) provide check stubs to verify his income, (3) show that he had a stable living environment, (4) complete random drug drops, (5) participate in individual therapy, and (6) attend supervised visits with J.C. It noted that respondent had not been in contact with agency staff and had failed to return any messages or letters to him. Respondent frequently missed visitation.

¶ 9 Another permanency hearing report was filed on August 31, 2017, which noted that respondent had only attended four out of seven of his weekly therapy appointments. Respondent had not completed his domestic violence course because he did not believe he should be required to participate as he had "done nothing wrong." Respondent refused to participate in a substance abuse assessment as he had "served his debt to society." He failed to complete any drug drops, and his visitation with J.C. was inconsistent. The court noted at a hearing on September 7, 2017, that neither parent had completed the services in the service plan. A permanency order dated October 19, 2017, again noted that respondent had yet to complete services.

¶ 10        The next permanency hearing report was filed on January 26, 2018. It noted that respondent never completed his therapy sessions, and his last session was in August 2017. He had still not completed his domestic violence course, his substance abuse assessment, or drug drops. It had not been verified that he had any steady income. DCFS changed its permanency goal to substitute care pending termination of parental rights. The court adopted this recommendation as neither parent had been participating in services. This remained the case throughout 2018. In May 2019, respondent began substance abuse treatment, and he completed the treatment in September 2019. However, the permanency hearing report filed on September 25, 2019, reported that respondent stated that he would test positive for marijuana. Respondent was unemployed and had still not completed the domestic violence course or therapy. He remained inconsistent with his visitation.

¶ 11        On November 5, 2020, the State filed a petition for termination of parental rights, alleging that respondent was unfit pursuant to sections 1(D)(g), (m)(i), (ii) of the Adoption Act (750 ILCS 50/1(D)(g), (m)(i), (ii) (West 2020)), in that he failed to make reasonable progress toward the return of J.C. during the nine-month period of November 4, 2016, to September 7, 2017. A permanency report filed on April 30, 2021, noted that respondent was cooperating with random drug drops, was taking parenting classes, had completed domestic violence classes, and had been attending his weekly visitation. However, the permanency goal was still termination because the case had been open for four years with minimal progress.

¶ 12        A hearing on the State's termination petition was held on June 21, 2021. At the beginning of the hearing, Crystal voluntarily surrendered her parental rights. Respondent's counsel asked for a brief continuance, stating,

"[T]here seems to be some conflicting information regarding completion of different classes that were assigned to [respondent] through DCFS, and the agencies that are involved in this case.

The caseworker tells me she does not have any of his certificates of completion, and [respondent] tells me he has certificates of completion for all of his matters, which I think would be relevant to the matter."

The State indicated that none of the certificates would be relevant as the services were not completed within the nine-month period set forth in the petition. Counsel stated that respondent could not complete the services within the nine-month period alleged in the petition because he was homeless after being released from prison. The State and the court indicated that information would be better presented at the best interest hearing. Counsel took a few moments to speak with respondent. When they returned on the record, counsel indicated that respondent would stipulate to the finding of unfitness and asked for a continuance for the best interest hearing.

¶ 13 The State provided the factual basis, stating that if the case went to the adjudication hearing, the caseworker would testify that during the requisite time period respondent failed to complete the requirements of the service plan. The court asked counsel if she was stipulating that there would be proof by clear and convincing evidence that respondent was an unfit parent as defined by statute. Counsel stated, "That's correct." The case was continued.

¶ 14 The best interest hearing began on November 10, 2022. J.C.'s foster care supervisor testified that J.C. had been placed with Barbara since the opening of the case, though she had been placed elsewhere twice during that time. She had no concerns about J.C. living with Barbara. Barbara's longtime partner, Keith, and J.C.'s younger sister also resided at the house.

¶ 15        Barbara testified that she and Keith had been in a relationship for 31 years and lived in the same house for 26 years. J.C. began residing with her when she was 7 years old, and she was 15 years old at the time of the hearing. J.C. was removed from Barbara's home for periods of six months and two months due to DCFS investigations into Keith and the cleanliness of the house. In each instance, J.C. was returned to the home after the investigation was concluded. J.C. had her own bedroom. She was involved as a junior firefighter in the area and attended church and youth group. J.C. was a sophomore at Watseka High School and had many friends. Barbara stated that J.C. was tired of the pending case and wanted it to be done. J.C. wanted to live with Barbara. J.C. had a good relationship with her younger sister. Barbara stated that it was her intent to adopt J.C. and that she believed she could continue to care and provide for her. J.C. had not seen respondent for two months because of "the way he talks to her and the way he treats her." Barbara said she encouraged J.C. to see respondent but did not force her to if she did not want to.

¶ 16        Respondent testified that he was not employed but was a full-time student. He stated that when he was released from prison, he immediately visited J.C. He was not aware of the DCFS case until months later. He said DCFS required him to complete services, but he felt that he did not do anything wrong, and he did not have the means to complete the services. Counsel introduced exhibits showing respondent's successful completion of a substance abuse program, domestic violence assessment, random drug drops, a domestic violence counseling program, and a parenting class. Respondent had a two-bedroom house with a backyard. If J.C. lived with respondent, she would attend school in Hoopston. Respondent stated that J.C. was rebelling in her current home because she missed respondent. He said that J.C. dressed inappropriately. Respondent further stated, "I pay for her phone. She never calls me and never texts me, so we had a falling out about that because I feel like it's a total lack of respect for her father. And, you

know, I see the cell phone addiction that goes on with people ***." Respondent did not believe Barbara's home was an appropriate environment for J.C. because Barbara and Keith would yell, curse, and disrespect respondent in front of J.C., and he did not think Barbara was strict enough. Respondent said when driving home one night he saw J.C. walking down the street at 10:30 p.m. with a boy. When asked why J.C. should not remain with Barbara, respondent stated, "it's just gonna continue to get worse. Keith and Barbara are two people that believe in giving drugs to kids. They gave them to all three of their kids." Respondent stated that he could be a full-time parent to J.C. and provide a productive and safe environment.

¶ 17      The guardian *ad litem* (GAL) report indicated that the GAL spoke with J.C. and respondent. J.C. stated that she was afraid of respondent's temper. J.C. felt happy and safe in Barbara's home. The GAL recommended that respondent's parental rights be terminated and that Barbara be allowed to adopt J.C., as she deserved stability.

¶ 18      The court took the matter under advisement and ultimately rendered its decision on January 13, 2023. The court stated that there was no doubt that respondent loved J.C. The court said that it had considered all the statutory factors as well as the evidence presented. The court noted that J.C. was safe; had adequate food, shelter, health, and clothing; was being provided for; and had a sense of attachment in her current placement. The court further noted that the case had been going on for a long time and J.C. had spent that time with Barbara. J.C. was involved in Watseka and had friends in the area. J.C. needed stability and felt safe and happy at Barbara's home. Thus, the court found it was in the best interest of J.C. to terminate respondent's parental rights.

¶ 19                          II. ANALYSIS

¶ 20    On appeal, respondent argues (1) counsel was ineffective for stipulating to respondent's unfitness, and (2) the court's finding that it was in the minor's best interest to terminate his parental rights was against the manifest weight of the evidence. We will consider each issue in turn.

¶ 21                        A. Ineffective Assistance of Counsel

¶ 22    The Act provides parents the right to be represented by counsel during the pendency of proceedings under the Act. 705 ILCS 405/1-5(1) (West 2022). Though proceedings under the Act lack constitutional footing, our supreme court has held that parents still deserve effective assistance of counsel. *In re Br. M.*, 2021 IL 125969, ¶ 42. We, thus, consider counsel's performance under the two-prong standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and determine whether counsel's performance was substandard, and respondent was prejudiced by such performance. *Br. M.*, 2021 IL 125969, ¶ 43. "Claims of ineffectiveness can be disposed of on the ground that the defendant suffered no prejudice from the claimed errors without deciding whether the errors were serious enough to constitute less than reasonably effective assistance." *In re Kr. K.*, 258 Ill. App. 3d 270, 280 (1994). When considering prejudice, we determine whether there is a reasonable probability that the result would have been different absent any deficient performance. *Id.*

> "In determining a parent's unfitness based on a lack of reasonable progress, the court may only consider evidence from the relevant time period. [Citations.] Courts are limited to the period alleged in the motion to terminate parental rights 'because reliance upon evidence of any subsequent time period could improperly allow a parent to circumvent her own unfitness because of a

bureaucratic delay in bringing her case to trial.' " *In re D.D.*, 2022 IL App (4th) 220257, ¶ 39 (quoting *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007)).

¶ 23    Here, we cannot find that respondent was prejudiced by counsel's decision to stipulate to his unfitness because the evidence of his unfitness was overwhelming. The relevant time period indicated in the petition was November 4, 2016, to September 7, 2017. During this time period, respondent did not complete any services and stated that he did not need to because he did not do anything wrong. In fact, for years respondent failed to complete any services or make reasonable progress. He completed substance abuse treatment in 2019, but then refused a drug drop, stating it would be positive for marijuana. It was only when the State filed the petition for termination in November 2020, that respondent started to make progress. While not stipulating to respondent's unfitness would have allowed counsel to show the court respondent's progress, any efforts he made occurred after September 2017, and would have had no bearing on respondent's unfitness as alleged in the petition. Moreover, we note that counsel took the time to discuss the stipulation with respondent, entered into the stipulation, and answered the court's questions about the stipulation. During this exchange, respondent did not make any objection. We cannot say that the results of the proceedings would have been different; therefore, counsel was not ineffective.

¶ 24                                    B. Best Interest of the Minor

¶ 25    When determining the child's best interest, the circuit court must consider the following statutory factors: (a) the physical safety and welfare of the child, including food, shelter, health, and clothing; (b) the development of the child's identity; (c) the child's background and ties, including familial, cultural, and religious; (d) the child's sense of attachment, including where the child feels loved, the child's sense of familiarity, continuity of affection for the child, and the least disruptive placement for the child; (e) the child's wishes and long-term goals; (f) the child's

community ties; (g) the child's need for permanence; (h) the uniqueness of every family and child; (i) the risks attendant to entering and being in substitute care; and (j) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2022). At a best interest hearing, the parent's interest in maintaining a relationship with their child must yield to the child's interest in maintaining a stable and loving home. *In re D.T.*, 212 Ill. 2d 347, 364 (2004). The State must prove by a preponderance of the evidence that termination of parental rights is in the best interest of the child. *Id.* at 366. On review, we will not disturb the circuit court's determination that it is in the best interest of the child to terminate the parental rights unless it is against the manifest weight of the evidence. *In re O.S.*, 364 Ill. App. 3d 628, 633 (2006).

¶ 26        After reviewing the statutory factors, it is clear that the court did not err in terminating respondent's parental rights. The evidence presented through the testimony and GAL report showed that the physical safety and welfare of J.C., including food, shelter, health, and clothing, are met by Barbara. J.C. has developed an identity and personality while living in Barbara's home. She has a strong bond with Barbara and her foster family, much more so than with respondent. J.C. has lived with Barbara for approximately eight years. She has developed ties with the community. J.C. attends church, goes to school, works as a junior firefighter, and has several friends. J.C. is happy, and Barbara wishes to adopt her. It is time to give her permanence and stability. See *In re J.L.*, 236 Ill. 2d 329, 344-45 (2010). Respondent has not pointed to any factors that favor reversing the court's order. Accordingly, the circuit court's finding that it was in the best interest of the child to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 27                                      III. CONCLUSION

¶ 28        The judgment of the circuit court of Iroquois County is affirmed.

¶ 29     Affirmed.