2019 IL App (1st) 190059

FIRST DISTRICT
SIXTH DIVISION
July 12, 2019

No. 1-19-0059

| | | |
|---|---|---|
| *In re* J.S., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Cook County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | No. 17 JA 1046 |
| v. | ) | |
| | ) | |
| Cynthia S., | ) | Honorable |
| | ) | Nicholas Geanopoulos, |
| Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Connors concurred in the judgment and opinion.

## OPINION

¶ 1    Respondent, Cynthia S., appeals the circuit court's determination that it had jurisdiction to rule on the State's petition for adjudication of wardship under the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA) (750 ILCS 36/201 (West 2016)). On appeal, Cynthia contends the trial court erred in finding it had jurisdiction where she had established her residency in Indiana when J.S. was born. For the following reasons, we affirm.

¶ 2                              JURISDICTION

¶ 3    After a finding of neglect, the trial court adjudicated J.S. a ward of the court on December 4, 2018. Cynthia filed a notice of appeal that same day. Accordingly, this court has jurisdiction pursuant to Illinois Supreme Court Rules 301 (eff. Feb. 1, 1994) and 303 (eff. July 1, 2017), governing appeals from final judgments entered below.

¶ 4                                         BACKGROUND

¶ 5     J.S. was born on September 24, 2017, at University Health Methodist Hospital (Methodist Hospital) in Indianapolis, Indiana. On October 11, 2017, the State filed a petition for adjudication of wardship, alleging neglect due to an injurious environment and abuse due to substantial risk of physical injury. In support, the petition stated that J.S.'s mother, Cynthia, has three children not in her care. One child is under private guardianship following a finding of neglect in 2006. Two children are currently under the care of the Department of Children and Family Services (DCFS) in Illinois after findings of neglect and abuse were entered on January 24, 2014. Their foster parent is Cynthia's grandmother. Cynthia was offered mental health, abuse, and parenting services, but she had not successfully completed those services.

¶ 6     On November 21, 2017, the trial court appointed a public defender to represent Cynthia. The assistant public defender objected, arguing the court had no jurisdiction because J.S. was not currently in, or had ever been in, Chicago. The petition was amended to reflect that J.S. had never left the hospital where she was born. At the adjudication hearing, the court allowed testimony by DCFS caseworker Belinda Childs regarding the jurisdiction issue.

¶ 7     Childs testified that she has been the caseworker for J.S.'s siblings since July 2017. They came into the system as a result of inadequate supervision, and they reside in Illinois. The contact information for Cynthia she had was at "115 and Elizabeth" in Chicago, and her phone number had a 312 area code. Childs testified that Cynthia did not complete her drug treatment program or individual therapy or parenting services. Referrals were based in Illinois, and visitation occurred in Illinois.

¶ 8     On July 31, 2017, Childs called Cynthia at a "773" phone number regarding a referral for anger management services at "Knock at Midnight," a place in Chicago. She also discussed

Cynthia's pregnancy, informing her that because her other children were in care, the new baby would come into care as well. Cynthia told Childs that she was not having the baby in Illinois and refused to provide her due date. On August 14, 2017, Cynthia contacted Childs regarding a referral for anger management services, telling her the building was closed. Cynthia did not indicate she was living anywhere other than Chicago.

¶ 9    On September 24, 2017, Cynthia left a voicemail for Childs stating that she was in a hospital giving birth to a girl but no location was provided. On October 2, 2017, Childs spoke with Cynthia, and Cynthia told her she had not yet given birth and the due date was October 9. Cynthia further stated that DCFS would not get her baby and she was moving to Arizona. At the time, Childs' agency was recommending that temporary custody of J.S. be taken because Cynthia had not completed services for her other children and J.S. would be at risk of harm if released to her. Childs subsequently learned that J.S. was born on September 24, 2017, at Methodist Hospital in Indianapolis. DCFS was granted temporary custody of J.S. on October 11, 2017. After custody of J.S. was granted, Cynthia faxed Childs a copy of an "interim extension Indiana regular ID card" dated October 13, 2017, with an expiration date of November 12, 2017.

¶ 10    DCFS child protection specialist, Minnie Carr, testified that she was assigned to J.S.'s case on October 4, 2017, while J.S. was at Methodist Hospital. The report she had listed Cynthia's address as 11550 South Elizabeth Street in Chicago. She went to that address and spoke with Betty Moore, who identified herself as Cynthia's aunt. Moore did not give an alternate address for Cynthia. Carr spoke with Cynthia on October 10, 2017, and Cynthia told her that she signed away her rights to J.S. but did not provide paperwork. She also told Carr that she had not seen her other children for three months and she had signed away her rights to them as well. She informed Carr that she was in Indiana but gave her official address as 11550 South

Elizabeth Street in Chicago. Carr also spoke with J.S.'s biological father, Dwayne B., whose cell phone number had a 630 area code. He refused to provide his date of birth or his address.

¶ 11    Medical records from Methodist Hospital, dated September 26, 2017, to December 4, 2017, were admitted into evidence. The records showed that J.S. was born on September 24, 2017, and she had "fetal alcohol exposure and polysubstance exposure," neurological issues, and "worsening feeding issues." The records indicated that Cynthia stated she drank a lot of wine coolers during the first two-thirds of her pregnancy. Cynthia has a history of possible schizophrenia, but stopped taking medications prior to her pregnancy, and is THC positive. Cynthia acted inappropriately with hospital staff respecting J.S.'s care and fell asleep while holding J.S.

¶ 12    On September 26, 2017, the hospital's social worker notified Indiana Child Protective Services because (1) Cynthia reported that she had an open case with DCFS in Chicago, (2) her inconsistent reporting about the location of her other children, (3) Cynthia's unaddressed mental health needs, and (4) her lack of prenatal care. Cynthia's medical record noted that she "has Illinois Medicaid, Illinois food stamps, and Illinois WIC." She told hospital personnel that she recently moved to Indianapolis from Chicago to live with her mother. The social worker planned to collaborate with Cynthia and DCFS regarding J.S.'s care and discharge.

¶ 13    J.S.'s medical records dated October 3, 2017, stated that her "MDS" returned positive for THC and she was "not yet taking [food] 100% by mouth." Therefore her discharge would be delayed. On October 11, 2017, the record stated that J.S. could not be discharged until October 13, and the hospital was informed that DCFS now had protective custody of J.S. The record indicated that J.S. was to be released to Carr upon discharge. Discharge was again delayed because J.S. could not take in food by mouth. After a "safe discharge" plan was in place, which

included having a pediatrician for J.S. and follow-up appointments, Methodist Hospital released J.S. to her foster parents in Illinois on December 2, 2017.

¶ 14    The State and public guardian rested. Frederick Armstrong then testified on behalf of Cynthia. He stated that although he and Cynthia dated on and off in the past, they were now just friends. On July 17, 2017, he took Cynthia to Indianapolis because she no longer wished to live in Chicago. They returned to Chicago the next day to pack up Cynthia's belongings, and then he took her back to her mother's house in Indianapolis. Armstrong testified that he made sure Cynthia "got her proper IDs and got her food stamp card" on July 19, 2017. He stated that she lost her ID and had to get another one when "she lost her wallet."

¶ 15    Relying on *In re D.S.*, 217 Ill. 2d 306 (2005), the trial court determined it had jurisdiction to consider the State's petition. It found that the case cited by Cynthia, *Maksym v. Board of Election Commissioners*, 242 Ill. 2d 303 (2011), did not apply because "it's apples to oranges, especially in light of the fact that there is a specific child custody jurisdiction act, and that's what this Court has to apply." The court found that J.S. "did not have a home state" and "[i]t just happened—she happened to be born in that hospital in Indianapolis." The trial court took into consideration Armstrong's testimony, finding it "interesting that none of the documents that would have substantiated the fact that [Cynthia] moved in July, *** all those documents magically disappeared because [Cynthia] keeps losing her wallet." The court also noted that Cynthia's temporary Indiana ID card "was issued *** two days after this Court took temporary custody or at least entered the order," and its expiration date indicates it "was acquired after the fact in this matter." The court reasoned that "[i]t would be a different situation if I had a voter's registration card, gas bills, public aid information months before the child was born and had those things in evidence."

¶ 16    The trial court also found that Cynthia has a significant connection with Illinois. It pointed to evidence that she has other children who reside in Illinois and noted that substantial evidence exists in Illinois regarding Cynthia's parental fitness and mental health. Cynthia's history of prenatal care regarding J.S. is located in Illinois. Furthermore, the court noted "that I was the judge on two of the sibling's cases *** so I'm aware of the history of the case. *** And I think that is important to note for the record."

¶ 17    The court then found J.S. to be neglected due to an injurious environment, based on the theory of anticipatory neglect. At the disposition hearing, the trial court heard evidence to determine whether to adjudge J.S. a ward of the court. Oji Eggleston, employed with Lutheran Social Services of Illinois, testified that she is the assigned worker for J.S. and the family. J.S. is presently in an appropriate foster home and is doing well. J.S. requires a G-tube for feedings but is gaining weight. She also receives speech and developmental therapy. In the past six month period, J.S has had two visitations with Cynthia in Chicago. However, J.S. visits with her two siblings in DCFS care every other week, and there are discussions for extended visits. J.S. also visits with her biological father. Eggleston testified that communication with Cynthia had been inconsistent and she had not engaged in any recommended services. When asked about Cynthia's current living situation, Eggleston responded that she lives with her mother in Indianapolis. Eggleston had never visited Cynthia in Indianapolis, nor had she sent any mail to that address. The trial court subsequently found Cynthia unable and unwilling to care for J.S. and adjudged J.S. a ward of the court. Cynthia appeals the trial court's determination but only on the issue of jurisdiction.

¶ 18                                                    ANALYSIS

¶ 19     Cynthia contends that the trial court did not have subject-matter jurisdiction to consider the State's petition. To clarify, while the UCCJEA uses the term "jurisdiction" to describe conditions that must be met before an Illinois court can decide a question of initial child custody, "jurisdiction" here does not mean "a precondition to the exercise of the court's inherent authority." *McCormick v. Robertson*, 2015 IL 118230, ¶ 27. Rather, "jurisdiction" under the UCCJEA is "simply a procedural limit on when the court may hear initial custody matters." *Id.* To define the term more broadly would conflict with well-established law holding that the circuit court has the authority, pursuant to our constitution, to consider all justiciable matters that do not fall within the original and exclusive jurisdiction of our supreme court. *Id.* ¶¶ 20, 27. In finding that it has jurisdiction, the trial court interpreted provisions of the UCCJEA. Therefore, we review the trial court's determination *de novo*. *In re D.S.*, 217 Ill. 2d at 313.

¶ 20     Section 201(a) of the UCCJEA outlines the circumstances in which "a court of this State has jurisdiction to make an initial child-custody determination." 750 ILCS 36/201(a) (West 2016). Illinois has jurisdiction if:

"(1) this State is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this State but a parent or person acting as a parent continues to live in this State;

(2) a court of another state does not have jurisdiction under paragraph (1) *** and

(A) the child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this State other than mere physical presence; and

(B) substantial evidence is available in this State concerning the child's care, protection, training, and personal relationships;

(3) all courts having jurisdiction under paragraph (1) and (2) have declined to exercise jurisdiction on the ground that a court of this State is the more appropriate forum to determine the custody of the child under Section 207 or 208; or

(4) no court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3)." *Id.*

¶ 21 The UCCJEA defines "home state" as

"the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child-custody proceeding. In the case of a child less than six months of age, the term means the state in which the child lived from birth with any of the persons mentioned." *Id.* § 102(7).

J.S. was born in Indiana, and Cynthia remained in Indiana while J.S. was in the hospital. We first determine whether Indiana has jurisdiction under the UCCJEA because it is the home state of J.S. Like the trial court, we find *In re D.S.* instructive.

¶ 22 In that case, the respondent lived in Hoopeston, Illinois, and was pregnant. She also had eight other children. Two lived with their father in Tennessee, and the remaining six children were wards of the State of Illinois following findings of neglect. When respondent asked her DCFS caseworker what would happen if she had her baby in Illinois, the caseworker told her the DCFS investigative unit would determine whether the baby should be taken into custody. Concerned that DCFS would take custody of her unborn child, respondent made plans to move to Tennessee. *In re D.S.*, 217 Ill. 2d at 309.

¶ 23    At an appointment with her obstetrician in Champaign, Illinois, respondent was told to report to the hospital immediately as the birth of her baby was imminent. Respondent instead got into her car and headed for Tennessee. She was in Crawfordsville, Indiana, when her contractions became unbearable. Respondent checked herself into a local hospital and gave birth to D.S. that night. *Id.* When respondent could not provide a local address to hospital personnel, other than saying she was from Hoopeston, a caseworker with the Indiana Child Welfare Service called Hoopeston police. The police were familiar with respondent because her doctor had called them the day before when respondent failed to report to the hospital as instructed. *Id.*

¶ 24    The Vermilion County State's Attorney's Office was contacted, and the State filed a petition for adjudication of wardship in the circuit court. The court held an emergency shelter care hearing after which the trial court found that it was a matter of immediate necessity to temporarily remove D.S. from respondent's custody due to the prior neglect findings against respondent and the possibility that respondent would flee with D.S. and conceal him from Illinois authorities. *Id.* at 310. At the adjudication hearing, evidence was presented of respondent's mental illness, " 'which directly impact[s] her ability to care for the child and her children.' " *Id.* at 311. The trial court found D.S. neglected due to an injurious environment, as supported by evidence of respondent's mental condition " 'that remains untreated' " and her decision to " 'hide the birth of this child by leaving the State without making any provision or arrangement for the birth of the child elsewhere.' " *Id.* The trial court found it was in the best interest of D.S. to be made a ward of the court. *Id.* at 312.

¶ 25    On appeal, respondent argued that the trial court lacked jurisdiction under the UCCJEA because at the time the state filed its petition, D.S. had never lived in Illinois. *Id.* Rather,

respondent argued, D.S.'s statutory home state was Indiana because he was born in Indiana and while in the hospital lived with respondent in Indiana prior to being brought to Illinois by DCFS.

¶ 26 The "home state" of a child less than six months of age is the state in which the child lived from birth with any parent or person acting as a parent. 750 ILCS 36/102(7) (West 2016). In construing the term "lived," the supreme court looked at cases from other jurisdictions and determined that "lived" meant "something more like 'to occupy a home.' " *In re D.S.*, 217 Ill. 2d at 317 (quoting Webster's Third New International Dictionary 1323 (1993)). The court reasoned that "[w]hen people speak of where a mother and newborn baby 'live,' they do not speak of the maternity ward. Instead, they speak of the place to which the mother and baby return following discharge from the hospital." *Id.* Furthermore, "allowing a temporary hospital stay to confer 'home state' jurisdiction would undermine the public policy goals of the UCCJEA, which include ensuring that 'a custody decree is rendered in that State *which can best decide the case* in the interest of the child.' " (Emphasis added.) *Id.* at 317-18 (quoting Unif. Child-Custody Jurisdiction & Enf't Act § 101 cmt., 9 U.L.A. 657 (1999)). Finding that a mere hospital stay is sufficient to confer home state jurisdiction would "turn[ ] the UCCJEA on its head, conferring jurisdiction on a state with a *de minimis* interest in the child." *Id.* at 318.

¶ 27 The supreme court thus rejected respondent's argument that Indiana was the home state of D.S. The court pointed to respondent's testimony that she had no connection to Indiana and had no intention to remain in that state following D.S.'s birth. Instead, she intended to move to Tennessee. Our supreme court agreed with the State that, for purposes of the UCCJEA, D.S. had no "home state." *Id.* at 314.

¶ 28 Since Indiana did not have jurisdiction as the "home state," the court looked at the factors set forth in section 201(a)(2) to determine if Illinois had jurisdiction. It found that D.S.'s father

and six of his half-siblings lived in Illinois and respondent was a longtime Illinois resident. Also, substantial evidence existed in Illinois concerning D.S.'s care, especially since his half-siblings are the subject of termination proceedings in the same circuit that determined D.S.'s initial custody, and "those proceedings have generated a substantial record relating to respondent's parental fitness and mental health." *Id.* at 319. Respondent's records were in Illinois, and she received prenatal care in Illinois before D.S. was born. Due to these significant connections, the trial court had jurisdiction under the UCCJEA to rule on the petition. *Id.* at 319-20.

¶ 29 Like the child in *In re D.S.*, J.S. was born in an Indiana hospital to a mother who was a resident of Illinois and had substantial ties to Illinois. Also, J.S. was in the hospital when DCFS initiated proceedings and never left the hospital before being released into DCFS custody in Illinois. A temporary hospital stay in itself is insufficient to confer jurisdiction. *Id.* at 319. A factual difference exists, however, between this case and *In re D.S.* In that case, the respondent did not intend for the actual birth state, Indiana, to be her home. She was merely passing through Indiana on her way to Tennessee. In contrast, Cynthia contends that she intended for Indiana to be her residence, and had J.S. been discharged from the hospital after birth, she would have gone home to live with Cynthia in Indiana. Cynthia therefore argues that Indiana is J.S.'s home state and *In re D.S.* is distinguishable.

¶ 30 Our supreme court in *In re D.S.* did not consider this situation because the respondent there did not give birth in Tennessee, the state where she intended to move. However, the court did make clear that a parent's established residence is a relevant factor in determining a child's home state. See *id.* at 317-18. The court reasoned that the state where a parent lives, works, pays taxes, attends church, and sends children to school is the state which can best decide a case in the interest of the child. *Id.* at 318. "[T]o establish residency, two elements are required: (1) physical

presence, and (2) an intent to remain in that place as a permanent home." (Emphasis omitted.) *Maksym*, 242 Ill. 2d at 319. There is no dispute regarding Cynthia's physical presence in Indiana. As for the second element, a person's intent in establishing a residence is shown primarily by her acts as well as testimony of her own intent, "though such testimony is not necessarily conclusive." *Id.* Instead, a person's "acts and surrounding circumstances should be given more weight in making the factual determination of intent." *Delk v. Board of Election Commissioners of the City of Chicago*, 112 Ill. App. 3d 735, 738 (1983).

¶ 31    Although Cynthia told Methodist Hospital staff that she recently moved to Indianapolis from Chicago to live with her mother, this evidence did not conclusively establish her intent to reside in Indiana as her permanent home. Rather, Cynthia's stated intent was contradicted by her actions and other statements. A little more than a month before J.S. was born, Cynthia asked her caseworker a question about a referral for anger management services in Illinois. Cynthia did not indicate she would be living anywhere other than Chicago. In October 2017, after J.S. was born, caseworker Carr went to Cynthia's address in the report, 11550 South Elizabeth Street in Chicago, where she spoke with Cynthia's aunt. Ms. Moore did not give an alternate address for Cynthia at the time. Although she had given birth on September 24, 2017, in Indiana, Cynthia told her caseworker on October 2, 2017, that she had not yet given birth and was planning a move to Arizona. Cynthia's record at Methodist Hospital noted that she "has Illinois Medicaid, Illinois food stamps, and Illinois WIC."

¶ 32    The trial court gave no credence to Cynthia's claim that she had moved to Indiana permanently in order to live with her mother. Evidence was presented that Cynthia simply wanted to leave Illinois to give birth so that DCFS could not investigate her case. Cynthia's caseworkers testified that while pregnant with J.S., Cynthia told them she was not having the

baby in Illinois because she did not want DCFS to get custody of her unborn baby. The trial court noted that the only evidence supporting Cynthia's intent to move was "a fax of [an ID] card that was issued after" J.S. was born. The court acknowledged Armstrong's testimony that he helped move Cynthia to Indiana in July, and at the time he helped her to get "her proper IDs and got her food stamp card." It also acknowledged his explanation that she did not have those documents because she lost her ID and had to get another one when "she lost her wallet."

¶ 33    The trial court, however, questioned the veracity of Armstrong's testimony. The court stated that "for all I know, he took the mother, [and] based on the testimony [of the caseworkers], he might have taken her there after the fact to help her in this endeavor to keep the child." The trial court did not find Armstrong's testimony credible, given the fact that no evidence such as bills paid, a voter's registration card, or public aid information existed to support Cynthia's intent to make Indiana her residence. The trial court is in the best position to judge the credibility of witnesses, and this court will not overturn its decision unless it is against the manifest weight of the evidence. *Department of Public Aid ex rel. Davis v. Brewer*, 183 Ill. 2d 540, 557 (1998). We agree with the trial court's finding that Indiana was not the home state of J.S. and thus had no jurisdiction under the UCCJEA.

¶ 34    Since Indiana was not the home state of J.S., we look at whether Illinois could exercise jurisdiction due to a significant connection with Cynthia and J.S. See 750 ILCS 36/201(a)(2) (West 2016); *In re D.S.*, 217 Ill. 2d at 319-20. The trial court noted that substantial evidence exists in Illinois regarding Cynthia's parental fitness and mental health. The record shows that Cynthia, a long time resident of Illinois, has three other children not in her care after findings of abuse and neglect against her. One child is under private guardianship in Illinois, and two are currently under the care of DCFS in Illinois. Cynthia was offered mental health, abuse, and

parenting services in Illinois, but she had not successfully completed those services. Furthermore, Cynthia's history of prenatal care involving J.S. is located in Illinois. The trial judge who ruled on the state's petition in J.S.'s case is the same judge presiding over the cases of Cynthia's two other children in DCFS custody. This evidence, similar to the evidence relied on by our supreme court in *In re D.S.*, supports the trial court's finding that Cynthia and J.S. have a significant connection with Illinois. Therefore, the court had jurisdiction under the UCCJEA to consider the State's custody petition.

¶ 35    Cynthia disagrees, pointing to the stated purpose of the Juvenile Court Act of 1987

> "to secure for each minor subject hereto such care and guidance, preferably in his or her own home, as will serve the safety and moral, emotional, mental, and physical welfare of the minor and the best interests of the community; [and] to preserve and strengthen the minor's family ties whenever possible." 705 ILCS 405/1-2 (West 2016).

She argues that finding Illinois has jurisdiction conflicts with the legislature's intent to place J.S. "at or near the home of her mother and grandmother in Indianapolis, and not 180 miles away in Chicago." She further complains that the state's position shows a disregard for her right as "a free person who can choose to live where she pleases" by treating her like "chattel of the State of Illinois, whose 'flight' is sufficient to confer subject matter jurisdiction on the Illinois courts."

¶ 36    Cynthia's argument, however, ignores the fact that she has three other children in Illinois who are J.S.'s siblings. Two of those siblings, whose foster parent is Cynthia's grandmother, are currently in DCFS care in Illinois. There have been regular and positive visits between J.S., her siblings, and the foster parents in Illinois. J.S. also visits with her biological father. The statute's purpose to preserve and strengthen J.S.'s family ties is clearly furthered by these visitations.

¶ 37    Furthermore, the state has not interfered with Cynthia's right "to live where she pleases." Although Cynthia would like to live in Indiana with her mother and J.S., she cannot simply erase the fact that she has two other children in DCFS care. Cynthia wanted to leave Illinois because she knew that the state would conduct an investigation after J.S.'s birth, which it was obliged to do given her involvement with DCFS. As our supreme court recognized, a "parents' rights are secondary to the State's strong interest in protecting children when the potential for abuse or neglect exists." *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 312 (1996).

¶ 38    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 39    Affirmed.

**No. 1-19-0059**

| | |
|---|---|
| **Cite as:** | *In re J.S.*, 2019 IL App (1st) 190059 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 17-JA-1046; the Hon. Nicholas Geanopoulos, Judge, presiding. |
| **Attorneys for Appellant:** | Amy P. Campanelli and Greg Koster, of Office of the Public Defender Office of Cook County, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Charles P. Golbert, Kass A. Plain and Mary Brigid Hayes, of Office of the Cook County Public Guardian, of Chicago, for appellee.<br><br>Kimberly M. Foxx, Alan J. Spellberg, Gina DiVito and Leslie Billings, of Office of the Cook County State's Attorney, of Chicago, for appellee. |