NOTICE
Decision filed 09/18/23.
The text of this decision
may be changed or
corrected prior to the
filing of a Petition for
Rehearing or the
disposi ion of the same.

2023 IL App (5th) 230295-U

NOS. 5-23-0295, 5-23-0296, 5-23-0297, 5-23-0298, 5-23-0299 cons.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed
under Supreme Court
Rule 23 and is not
precedent except in he
limited circumstances
allowed under Rule
23(e)(1).

_____

| | | |
|---|---|---|
| *In re* K.H., I.H., I.H., I.H., and K.H., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Jackson County. |
| | ) | |
| Petitioner-Appellee, | ) | Nos. 22-JA-30, 22-JA-31, |
| | ) | 22-JA-32, 22-JA-33, & |
| v. | ) | 22-JA-34 |
| | ) | |
| I.H., | ) | Honorable |
| | ) | Ella L. Travelstead, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Justices Welch and McHaney concurred in the judgment.

**ORDER**

¶ 1   *Held*: The circuit court did not abuse its discretion by entering an amended adjudicatory order. Father failed to demonstrate that he received ineffective assistance of counsel. The circuit court's findings in the adjudicatory orders and dispositional orders were not against the manifest weight of the evidence.

¶ 2   The respondent, I.H. (Father), appeals from the amended adjudicatory orders and dispositional orders entered by the circuit court of Jackson County in the juvenile cases for his five children. Father additionally claims that he received ineffective assistance of counsel. For the following reasons, we affirm.

1

¶ 3                           I. BACKGROUND

¶ 4    The respondent, I.H. (Father), is the biological father and K.S. (Mother) is the biological mother of K.H., born September 29, 2016, I.H., born May 1, 2018, I.H., born May 1, 2018, I.H., born April 29, 2019, K.H., born August 4, 2020, and I.H., born December 1, 2021. K.H., who was born August 4, 2020, in St. Louis, Missouri, has been hospitalized since birth and resides in a long-term care facility in Indiana. I.H., born April 29, 2019, died on June 22, 2022. Mother and Father were arrested due to her death. Their four children who remained at home were taken into protective custody after the arrest of Mother and Father, while their fifth child remained in the long-term care facility in Indiana.

¶ 5    Mother and Father have a history of involvement with the Department of Children and Family Services (DCFS). Mother had three children, D.M., born March 3, 2001, D.S., born September 5, 2002, and T.S., born May 4, 2004, before forming a relationship with Father. I.H., born April 15, 2006, I.H., born February 22, 2007, K.H., born April 11, 2009, T.H., born July 20, 2011, K.H., born May 28, 2012, T.H., born June 27, 2013, and K.H., born July 1, 2014, were also the biological children of Mother and Father. The seven oldest children were removed from Mother and Father's care in April of 2012, as a result of allegations of significant abuse by Father. The youngest three children, K.H., born May 28, 2012, T.H., born June 27, 2013, and K.H., born July 1, 2014, were subsequently taken into custody after their births. K.H., who was born at 30 weeks gestation on July 1, 2014, died on May 20, 2015, while in foster care. Father surrendered his parental rights to his biological children in the prior juvenile cases. The circuit court entered an order terminating Mother's parental rights. Mother appealed, and we affirmed the judgment of

2

the circuit court of Jackson County. See *In re Demonquez M.*, 2016 IL App (5th) 150130-U.

¶ 6    On June 27, 2022, the State filed five juvenile petitions for Mother and Father's children born between September 29, 2016, and December 1, 2021. The petitions were substantially similar as each petition alleged neglect based on the child being in an environment injurious to her welfare and they were not receiving proper support or medical care pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2-3(1)(a), (b) (West 2020)). In the juvenile petition for K.H., the child living in a long-term care facility, the State additionally alleged that Mother and Father were uncooperative with the hospital in providing medical care and they have not received the training necessary to allow the child to return home.

¶ 7    The State's petitions averred that the minors' three-year-old sibling was brought to an emergency room by Father and died at the hospital. The child appeared to be malnourished and "had the stature of an 18-month-old rather than that of a 3-year-old." Mother and Father were arrested on charges related to the death of their child in People v. Hill, No. 2022-CF-313 (Cir. Ct. Jackson County) and People v. Simelton, No. 2022-CF-314 (Cir. Ct. Jackson County). Mother and Father were incarcerated, and the surviving children were taken into protective custody.[1]

¶ 8    The petitions additionally averred that the children living at home with Mother and Father were malnourished, and some had marks around their ankles which appeared to be

---

[1]K.H., born August 4, 2020, remained at the extended care facility in Indiana.

caused by restraints. The six-year-old, K.H., was not able to eat, unable to communicate, and had to be held constantly. K.H. and her siblings wore diapers although diapers should not have been necessary at their ages. Their bedrooms only contained a mattress or bed. Notably, there were cameras in the bedrooms and throughout the house. The petitions referenced the prior juvenile cases where Mother's parental rights were terminated and Father surrendered his parental rights.

¶ 9     The State subsequently filed amended petitions which requested expedited termination of parental rights and the appointment of a guardian with power to consent to adoption. The State alleged that Father was unfit under multiple sections of the Illinois Adoption Act including: (a) repeated or continuous failure by the parents to provide the child with adequate food or clothing (750 ILCS 50/1(D)(*o*) (West 2020)); (b) continuous or repeated substantial neglect of the child (750 ILCS 50/1(D)(d) (West 2020)); (c) continuous or repeated substantial neglect of any child residing in the household that resulted in the death of that child (750 ILCS 50/1(D)(d-1) (West 2020)); (d) failure to protect the child from conditions within her environment injurious to the child's welfare (750 ILCS 50/1(D)(g) (West 2020)); or (e) depravity based on Father's conviction of aggravated battery of a child (750 ILCS 50/1(D)(i) (West 2020)). The State requested that the circuit court find, by clear and convincing evidence, at the conclusion of the adjudicatory hearing that Father was unfit.

¶ 10                          A. Shelter Care Hearing

¶ 11    The shelter care hearing was held after the children were placed in protective custody. Alyssa Norman, an investigator from DCFS, testified. Norman became involved

4

after she received a report that Mother and Father's three-year-old child died on June 22, 2022. Because both parents were arrested, the children were taken into protective custody. When the children were removed from their parents' care, they were taken to the hospital because they appeared to be malnourished. The three older children were "very dirty" and "non-verbal for their ages." They appeared as if they did not know how to eat or drink, other than out of a bottle. Norman noticed marks on the ankles of the children. Norman testified that she touched the ankle of one of the twins, and the child cried in pain. The youngest child also had a mark on an ankle but appeared to be more well-nourished than the older children.

¶ 12    Norman testified that the three older children were transferred from the emergency room to the St. Louis Children's Hospital due to malnourishment and dehydration. The baby did not require further hospitalization. K.H., born August 4, 2020, remained hospitalized in Indiana.

¶ 13    Norman testified that if K.H. were to be released from the Indiana hospital, the hospital would contact the parents. Mother and Father were previously not cooperative with K.H.'s care and needed to learn how to care for K.H. if she were to return home. Norman was not aware if Mother and Father resolved the issue.

¶ 14    The circuit court found that there was probable cause for the filing of each of the five petitions, and there was an immediate and urgent necessity to remove the minor children from the household. DCFS was given temporary custody and guardianship.

¶ 15    On December 6, 2022, the guardian *ad litem* (GAL) filed a motion to cease visitation where it was not in the children's best interests to have visitation with Mother.

Father remained incarcerated and was not included in the motion. The GAL asserted in her motion that on November 9, 2022, Mother had pleaded guilty to endangering the life or health of her child in People v. Simelton, No. 2022-CF-314 (Cir. Ct. Jackson County). In that criminal matter, Mother acknowledged that she failed to protect her children from the harm they suffered in their home.

¶ 16                                B. Adjudication

¶ 17    The adjudicatory hearing was held on February 23, 2023. Justin Haney, a special agent with the Illinois State Police, testified. Haney was a member of the Child Death Task Force. He testified that he attended the autopsy of I.H. and her cause of death was blunt trauma to the abdomen which caused internal bleeding.

¶ 18    Rebecca Grammer, a child protection advanced specialist with DCFS, also testified. Grammer indicated that several children were previously removed from Mother and Father's care. In the prior cases, DCFS was concerned with domestic violence between Mother and Father as well as "excessive physical punishment" that resulted in injuries. DCFS was also concerned that the children did not receive food on a regular basis.

¶ 19    Grammer further testified to the removal of the four children from Mother and Father's care in this matter. Mother and Father refused to give DCFS access to their home. On June 23, 2022, the Illinois State Police SWAT team entered the home to remove the children. DCFS caseworkers waited approximately a half block away to receive the children. They did not enter the home to view the conditions.

¶ 20    The police carried the children to the caseworkers. The children did not have the strength or knowledge to climb into car seats. Grammer testified that the baby was "chunky

6

and healthy looking." The other three children appeared "extremely small" and "extremely frail looking." The children all wore diapers. The four-year-old twins and the six-year-old appeared to have their own language. Grammer testified that they "were kind of making noises, like beeps." The children were taken to an emergency room in Herrin, Illinois.

¶ 21    Grammer testified to being in the emergency room with the children. Grammer explained that the children were unable to walk and testified that "you would stand them up and it was almost like they had frog legs. They would go back down to the floor." The children were offered food and they did not know what to do with the food. For example, the six-year-old child, K.H., smashed a cracker with her hands and then licked her hands.

¶ 22    Morgan Echols, a physician's assistant with Herrin Hospital, testified that she treated the four children in the emergency room. According to Echols, the twins' condition was "very poor." The twins were nonverbal, and they were unable to walk. One twin would not eat or drink, while the other twin consumed everything given to her. She would grab the food and smash it. She did not appear to know how to use a fork or a spoon. The children also did not know to drink from a cup or use a straw. They would only drink from a bottle.

¶ 23    Echols testified that the twins were in the first or second percentile on the children's height and weight chart. The six-year-old was also at the very bottom of the chart. The baby was in the upper range and appeared healthy. Echols testified that the three older children were "cachectic" and "very unhealthy and needed medical attention fairly immediately." Echols explained that the children had low glucose levels which meant that "they hadn't had anything to eat or drink recently. They are hungry." Echols further

7

testified that it would have taken years to reach their level of malnutrition. The children required medical attention and were not "fit to be discharged into a foster care anywhere."

¶ 24    Echols testified to ligature marks around the ankles and feet of the children. She explained that a ligature mark was made by anything that tied off. The marks could have been caused by string, a zip tie, or a metal cable, but she was not aware of what caused the marks. The baby, I.H., had a scarred diaper rash that was never treated. One of the twins had what appeared to be an old cigarette burn on the back of her leg and an inward turning foot that she would not let anyone touch. Echols testified that the children were fearful, screamed, and were "trying to kind of claw and push us away, hit, scratch. Anything they could do to get away from us."

¶ 25    Echols additionally testified that the children, except for one, did not have a medical history in the "SIH system," a records system that can be seen throughout several states and the local area. One child had one past visit in her chart where she had recently tested positive for Covid. While in the emergency room the children tested negative for Covid. Medical records from the emergency room visit were admitted into evidence.

¶ 26    Mekenna Arca, a physician at St. Louis Children's Hospital, testified. Dr. Arca specialized in pediatrics and treated the three older children after they were transferred from the emergency room to Children's Hospital. The oldest child was able to say, "go away" and "mom." She would otherwise babble. The twins would babble and did not speak "real words." Dr. Arca testified that when food was given to the children, "they'd wipe it on their faces, they would crunch crackers up and play with it. They did know how to drink

8

out of a bottle but not a sippy cup." None of the children were toilet trained. The six-year-old was able to walk, but Dr. Arca was not aware if the twins were able to walk normally.

¶ 27 One of the twins was considered "moderately malnourished" and the other twin had a BMI in the lower end of the normal range. She received a nasogastric tube after being monitored for several days because she was not "taking in enough to sustain adequate nutrition." The six-year-old met the criteria for "mild malnutrition." Dr. Arca testified that none of the children had an underlying medical condition that could have caused the malnutrition.

¶ 28 The children were monitored for refeeding syndrome. Dr. Arca explained that "when your body has not seen food or good nutrition and you start to give it the nutrition it needs, the calories it needs, you can start to have electrolytes derangement until the body figures out what to do with the nutrients that it's not used to seeing." The children did not develop refeeding syndrome while in care.

¶ 29 Dr. Arca testified that she only treated the children for a week, but they continued treatment at Children's Hospital for a couple of months. She believed that they were transferred from Children's Hospital to Ranken Jordan, a pediatric bridge hospital that provided intensive rehabilitation for children. The children needed to learn how to eat and needed developmental therapy, speech therapy, occupational therapy, and physical therapy. Medical records from St. Louis Children's Hospital were admitted into evidence.

¶ 30 Alyssa Norman, a child protective specialist with DCFS, also testified. Norman is also a member of the Illinois Child Death Task Force. Norman investigated Mother and

9

Father and "indicated" Mother and Father on numerous allegations related to abuse and neglect of the children. A summary of the indicated reports was admitted into evidence.

¶ 31    On March 13, 2023, the circuit court entered an adjudicatory order finding that each of the children were neglected in that they were in an environment that was injurious to their welfare, and they were not receiving proper support or medical care. The circuit court's adjudicatory orders specifically stated:

> "This finding is based on the following facts: the minors [K.H., I.H., and I.H.] are medically neglected and severely malnourished and the parents failed to provide adequate food and nutrition despite having the ability to do so. The minors [K.H. and I.H.] are minors for whom the respondents are also responsible and considering the circumstances and proof of malnourishment and medical neglect of the minor's siblings, the Court finds sufficient evidence the minors [K.H. and I.H.] are in an injurious environment."

DCFS was ordered to prepare and submit a dispositional report. The Guardianship Administrator of DCFS was granted authority to consent to medical treatment and DCFS remained as the legal custodian of the minors with authority to place the minors.

¶ 32    The circuit court amended its adjudicatory order *sua sponte* on March 24, 2023, to include the language "on the basis of clear and convincing evidence admitted at the adjudicatory hearing the parents, [Mother] and [Father], pursuant to 705 ILCS 405/2-21(5), are unfit persons under subdivision D of Section 1 of the Adoption Act." The findings made by the circuit court were identical to the initial adjudicatory orders.

¶ 33                              C. Dispositional Report

¶ 34    The dispositional report was submitted to the circuit court on March 21, 2023, by Marissa Moss, the DCFS caseworker, and Morgan White, the DCFS supervisor. The report included that DCFS became involved with the family after an emergency report of the

10

death of three-year-old I.H. When Father presented I.H. to the ER, he stated that the entire family had contracted Covid. He administered "syringes and suppositories" but I.H. would not get better.

¶ 35 The dispositional report included a history of DCFS involvement and indicated reports. Father was investigated by DCFS in 2012, 2014, and 2022, and indicated for multiple allegations of abuse and neglect. The latest DCFS report, June 22, 2022, indicated Mother and Father for: death by abuse; cuts, welts, and bruises; death by neglect; internal injuries by neglect; internal injuries by abuse; cuts, bruises, welts, abrasions, and oral injuries by neglect; malnutrition; and substantial risk of physical injury/environment injurious to health and welfare by neglect.

¶ 36 The dispositional report additionally included that Father failed to participate in an integrated assessment (IA). DCFS, however, was able to gather information from a previous integrated assessment and his history with DCFS. The clinical screener, Kimberly Huss, LCWS, reported in Father's IA that:

> "Because the State is seeking to terminate reasonable efforts, and because [Father] has, for ten years, shown no ability to correct the conditions in his home, we do not feel that there are any services that can be provided to [Father] to ensure that any child will ever be safe in his care. The level of risk presented in this case, long history of child welfare involvement and failed historical efforts, despite multiple interventions, to render changes in behavior, and the severity of child abuse and neglect that has occurred is significant. We do not feel that there are any services that can be offered to [Father] that will provide him with the skills to safely parent a child. The Assessment Team offers no recommendations for [Father]."

The report included that DCFS was required to complete a service plan for all parents until a goal other than to return home has been established. DCFS provided Father with a service

11

plan that included requirements to complete parenting and mental health services and to cooperate with DCFS. Father had not been involved in any services due to his incarceration. Father was incarcerated at the Jackson County jail on charges for murder, aggravated battery of a child, and child endangerment/death. The report additionally included that due to his prior DCFS case, Father was on the violent offender's registry and was convicted of aggravated battery to a child under the age of 13 years old.

¶ 37 The dispositional report included that three-year-old I.H. died due to internal bleeding because of a liver laceration and contusion. She suffered from blunt force trauma to the abdomen. I.H. additionally suffered from significant continuing starvation, dehydration, and neglect which were found as underlying causes connected to her death. Her siblings were subjected to the same living environment.

¶ 38 The three older children were placed in a long-term medical facility to receive physical, occupational, and speech therapy. They were all considered medically fragile and diagnosed with malnutrition, feeding difficulty, speech delay, and motor delay, secondary to severe emotional and physical neglect. Each of the three children had a G-tube placed and have gained weight since coming into care. They additionally required medication to sleep, multiple psychotropic medications, and sedatives during bath times. One of the twins was diagnosed with type 1 diabetes. Both twins had sensory deprivation and were

diagnosed with disinhibited social engagement disorder, which is a trauma-related diagnosis in the DSM-5.[2]

¶ 39   The six-month-old baby, I.H., was placed in a foster home and was receiving physical and occupational therapy, as well as early childhood services. She was diagnosed with feeding difficulty and left foot excessive supination. Mother and Father have an additional child, K.H., who was hospitalized at birth and subsequently transferred to a long-term care facility in Indiana, where she remains. K.H. has a G-tube placed and is dependent on a ventilator.

¶ 40   The report also addressed that the State and the GAL filed motions for expedited termination of parental rights and early termination of reasonable efforts. The parents had not been receiving visitation with the children and the GAL filed a motion for no visitation. DCFS believed that visitation would not be in the best interests of the children due to the significant trauma experienced by the children in the same home that contributed to their sister's death. DCFS recommended that DCFS be granted custody and guardianship of the minors and early termination of Mother and Father's parental rights.

¶ 41                              D. Dispositional Hearing

¶ 42   On March 27, 2023, the State informed the circuit court that based on the findings during the adjudicatory hearing, the State was not proceeding with expedited termination of parental rights during the dispositional hearing. The circuit court confirmed that the

_____

[2]The DSM-5 is the standard classification manual of mental disorders used by mental health professionals in the United States. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 5th Edition, DSM-5 *Trauma- and Stressor-Related Disorders* 268-270 (2013).

parties received a copy of the dispositional report filed by DCFS and then proceeded with the dispositional hearing.

¶ 43 The State did not present any witnesses. The GAL informed the circuit court that the dispositional report was well written, lengthy, and detailed and she was not presenting witnesses.

¶ 44 Father's counsel objected to the dispositional report referencing the autopsy findings for I.H. where the autopsy was not admitted into evidence during the adjudication hearing and no witness testified to the autopsy. The State argued that under the Juvenile Court Act (705 ILCS 405/2-22(1) (West 2022)), all evidence helpful in determining the questions of the best interests of the minors, "including oral and written reports, may be admitted and may be relied upon to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." The State further argued that the circuit court can rely on information presented at the dispositional hearing that could not be admitted into evidence at the adjudicatory hearing.

¶ 45 The circuit court denied Father's objection to the dispositional report. While the circuit court was ruling on Father's counsel's objection, Mother and Father were interjecting comments. The circuit court informed Father that his attorney made objections on his behalf and Father requested to testify.

¶ 46 Father's counsel called Marissa Moss, the DCFS caseworker, to testify. Moss testified that she authored the March 2023 dispositional report. Moss testified that Father had not participated in an IA because he wanted to wait until after the disposition hearing. Moss testified that Father had a service plan that contained requirements for parenting and

14

mental health services, and Father was required to cooperate with DCFS. Father was not involved in any services due to his incarceration. Mother's counsel additionally questioned Moss regarding Mother's IA and recommended services for Mother. Mother had not initiated any services.

¶ 47 The State cross-examined Moss. Moss testified that DCFS's recommendations for the disposition of the five juvenile cases were included in the written report. Father's counsel questioned Moss on whether the recommendations by DCFS changed because the State was no longer proceeding with the termination efforts at the dispositional hearing. Moss testified that the State's decision did not affect DCFS's recommendation and stated, "In the [IA] it's stated that they do not feel that there were any services that could correct the conditions that led to DCFS involvement and protect the children from the unsafe environment that the parents have offered in the past." Moss additionally testified that visitation would not be in the best interests of the children.

¶ 48 Father then testified on his own behalf. The circuit court admonished Father. Father was aware that the testimony he provided could affect the pending criminal matter; he was knowingly and voluntarily agreeing to testify; and no one threatened him or promised him anything to force him to testify. Father testified that the children involved in this case were born after the prior proceeding concluded. Father testified that in 2017, a juvenile proceeding took place in Alexander County, Illinois, and Mother and Father were granted custody of K.H., the oldest child involved in this juvenile proceeding. Father testified that he reviewed the dispositional report and was aware that his caseworker recommended that no services could be provided and visitation would not be offered. Father additionally

testified that he believed services could be provided while he was incarcerated. Father was willing to complete any services recommended by DCFS and complete an IA.

¶ 49 The State cross-examined Father. Father acknowledged that four of his children were immediately hospitalized when they were removed from his care. Father additionally was aware that four of his children remained in a hospitalized setting. Mother did not testify or present additional witnesses.

¶ 50 The State recommended that DCFS receive custody and guardianship of the five children, which included K.H. in Indiana. The GAL additionally recommended that the children should be made wards of the court and that DCFS should receive custody and guardianship.

¶ 51 The circuit court found that it was consistent with the health, welfare, and safety, and in the best interests of all five minors that they be made wards of the court. The circuit court based its decision on the dispositional report as well as testimony presented. The circuit court found that Mother and Father were unfit to parent the children. DCFS received custody and guardianship of the children.

¶ 52 The circuit court then addressed the motion to cease visitation filed by the GAL. The GAL argued that three of the children were receiving intensive treatment in a long-term care facility in Illinois due to their trauma, one child was in an out-of-state facility, and the baby was in foster care. Visitation with Mother was not in the children's best interests. The GAL referenced Mother's guilty plea in People v. Simelton, No. 2022-CF-314 (Cir. Ct. Jackson County) where Mother acknowledged that she failed to protect the children from harm. Father argued that although the GAL's motion did not specifically

16

relate to him, due to his incarceration, the denial of visitation would result in unintended consequences with the parent's cooperation with DCFS.

¶ 53 The circuit court granted the motion to cease visitation. The circuit court then addressed the appropriate goals for the five children. The State did not provide a recommendation. The GAL suggested that the circuit court could enter the goal of "cannot be provided for in the home" but did not provide a recommendation. Father argued that because the State was not proceeding with early termination efforts that the goal should involve reunification with the children. The State clarified that it had not elected to not proceed on the termination of parental rights. Rather, the State believed it was in a position where it could not legally go forward with termination during the dispositional hearing.

¶ 54 The formal written dispositional orders were entered on March 28, 2023. The written order stated that the goals for the four older children would be "cannot be cared for in the home environment." The goal of "return home within 12 months" was entered for the youngest child, I.H. The circuit court additionally ordered that an incarcerated parent shall not receive visitation. Father appealed in each of the five children's cases and the appeals were consolidated.

¶ 55                                    II. ANALYSIS

¶ 56 On appeal, Father claims that the circuit court abused its discretion where it *sua sponte* entered an amended adjudicatory order that included a finding of unfitness. Father claims that he received ineffective assistance of counsel. Father additionally claims that the adjudicatory and dispositional orders were against the manifest weight of the evidence.

17

¶ 57    The Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) provides a two-step process to decide whether a minor should become a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. The first step is the adjudicatory hearing on the petition of wardship. *In re A.P.*, 2012 IL 113875, ¶ 19. "At the adjudicatory hearing, the court shall first consider only the question [of] whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2022). The State must prove neglect, dependence, or abuse by a preponderance of the evidence. *In re N.B.*, 191 Ill. 2d 338, 343 (2000). A circuit court's finding of abuse or neglect will only be reversed if it is against the manifest weight of the evidence. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 47.

¶ 58    If the circuit court determines that a minor has been abused, neglected, or dependent, then the circuit court proceeds to the second step, the dispositional hearing. *In re A.P.*, 2012 IL 113875, ¶ 21. During the dispositional hearing, the circuit court determines whether it is consistent with the health, safety, and best interests of the minors and the public for the minors to be made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 21. The circuit court additionally considers the permanency goal set for the minor at the dispositional hearing. 705 ILCS 405/2-22(1) (West 2022). A circuit court's determination of wardship will be reversed if the factual findings are against the manifest weight of the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. *In re Davon H.*, 2015 IL App (1st) 150926, ¶ 58.

¶ 59    The termination of parental rights proceedings are governed by the Juvenile Court Act (705 ILCS 405/1-1 *et seq.* (West 2022)) and the Adoption Act (750 ILCS 50/0.01 *et seq.* (West 2022)). *In re D.T.*, 212 Ill. 2d 347, 352 (2004). In certain circumstances, it

may be appropriate to proceed with expedited termination of parental rights. See 705 ILCS 405/1-2(1)(a) (West 2022). Expedited termination of parental rights may occur at the dispositional hearing if the following conditions are met: (i) "the original or amended petition contains a request for termination of parental rights and appointment of a guardian with power to consent to adoption"; (ii) the abuse, neglect, or dependency of the minor has been found by a preponderance of the evidence; (iii) parental unfitness has been found by clear and convincing evidence at the adjudication hearing; and (iv) "the court determines in accordance with the rules of evidence for dispositional proceedings" that it is in the best interest of the minor and the public for the minor to be made a ward of the court; reasonable reunification efforts are inappropriate or were unsuccessful; and termination of parental rights is in the minor's best interest. 705 ILCS 405/2-21(5) (West 2022).

¶ 60    The State alleged that the children were neglected pursuant to sections 2-3(1)(a) and (b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(a), (b) (West 2020)), in that the children's environment was injurious to their welfare and they were not receiving the proper support or medical care necessary for their welfare. The allegations included that the children's sibling, I.H., died on June 22, 2022, and Mother and Father were arrested and incarcerated on charges relating to I.H.'s death. Medical examinations of the children residing with Mother and Father established that three of the four children showed significant signs of neglect, malnourishment, and the children had marks around their ankles indicating that they may have been in restraints.

¶ 61    During the adjudicatory hearing, testimony was presented from Justin Haney, a special agent with the Illinois State Police, that the children's sibling, I.H., died due to blunt

19

trauma to the abdomen which caused internal bleeding. Rebecca Grammer, the DCFS investigator, testified that the four-year-old twins and the six-year-old were "extremely frail looking." They wore diapers, were unable to walk, and did not understand how to eat solid food. They also appeared to have their own language where they would "beep." Morgan Echols, a physician's assistant with Herrin Hospital, testified that it would have taken years to reach their level of malnutrition. Echols additionally testified that the children had ligature marks on their ankles, the baby had scarred untreated diaper rash, and there appeared to be a cigarette burn on the back of one of the children's legs.

¶ 62    Testimony was presented from Dr. Arca that one of the twins was "moderately malnourished" and the six-year-old met the criteria for "mild malnutrition." None of the children had an underlying condition that could have caused the malnutrition. After the children received care from Children's Hospital, they were transferred to a pediatric bridge hospital that provided intensive rehabilitation. The three older children needed to learn how to eat and would benefit from developmental therapy, speech therapy, occupational therapy, and physical therapy. Sufficient evidence was presented during the adjudicatory hearing for the circuit court to make its determination of neglect.

¶ 63    Father argues that the circuit court abused its discretion in amending its order to include a finding required for expedited termination under section 2-21(5) of the Juvenile Court Act (705 ILCS 405/2-21(5) (West 2022)). A circuit court has jurisdiction to either modify or vacate a final judgment for a period of 30 days after entry, either on motion of a party or *sua sponte. Parello v. Parello*, 87 Ill. App. 3d 926, 931 (1980). We cannot say that the circuit court's determination that Father was unfit was unsupported by the record. The

State, however, withdrew its request to pursue expedited termination of Father's rights at the disposition hearing. The language added by the circuit court in its amended adjudicatory order had no bearing on the circuit court's determination that the minors were neglected. The circuit court's findings of neglect were not against the manifest weight of the evidence.

¶ 64    We turn to Father's claim of ineffective assistance of counsel. Parents of the minors subject to the proceedings under the Juvenile Court Act have "the right to be represented by counsel." 705 ILCS 405/1-5(1) (West 2022). The *Strickland* standard applies to abuse and neglect cases. *In re Kr. K.*, 258 Ill. App. 3d 270, 280 (1994). Under *Strickland v. Washington*, 466 U.S. 668 (1984), to establish a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient and (2) the deficient performance resulted in prejudice. *People v. Hughes*, 2012 IL 112817, ¶ 44.

¶ 65    "Both prongs of the *Strickland* test must be satisfied, and a failure to satisfy either one of the prongs precludes a finding of ineffectiveness." *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 42. Counsel is not required to perform the useless act of objecting where evidence is admissible and cannot be faulted for failing to do so. *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 66. Where an ineffective assistance of counsel claim has not been raised before the circuit court, our review is *de novo*. *People v. Lofton*, 2015 IL App (2d) 130135, ¶ 24.

¶ 66    The purpose of the dispositional hearing is to allow "the circuit court to decide what further actions are in the best interests of a neglected, abused, or dependent minor," and it "give[s] the parents fair notice of what they must do to retain their rights to their child."

21

*In re G.F.H.*, 315 Ill. App. 3d 711, 715 (2000). At the dispositional hearing, the rules of evidence are "substantially relaxed." *In re Ca. B.*, 2019 IL App (1st) 181024, ¶ 56. Oral and written reports may be admitted into evidence and relied on by the circuit court at the dispositional hearing, "to the extent of its probative value, even though not competent for the purposes of the adjudicatory hearing." 705 ILCS 405/2-22(1) (West 2022). Additionally, the circuit court may, on its own motion, adjourn the dispositional hearing for a reasonable period to receive reports or other evidence. 705 ILCS 405/2-22(4) (West 2022).

¶ 67    To assist the court in making the determination of whether a child should be made a ward of the court, the court may order that an investigation be conducted and a dispositional report be prepared. 705 ILCS 405/2-21(2) (West 2022). "Before making an order of disposition the court shall advise the State's Attorney, the parents, guardian, custodian or responsible relative or their counsel of the factual contents and the conclusions of the reports prepared for the use of the court and considered by it, and afford fair opportunity, if requested, to controvert them." 705 ILCS 405/2-22(2) (West 2022).

¶ 68    Father argues that the State would not have met its burden had Father's counsel refrained from eliciting testimony from the DCFS caseworker who provided extensive testimony in support of the State's petition. As a result of that testimony, Father acknowledges that sufficient evidence was presented at the dispositional hearing for the circuit court to make its determination. We disagree with Father's contention that had his counsel not elicited testimony from the DCFS caseworker, the circuit court could not have made its determination.

¶ 69 Father's counsel questioned Marissa Moss, the DCFS caseworker who authored the dispositional report, on whether the dispositional report accurately stated DCFS's recommendations and questioned Moss on the requirements of Father's service plan. Father's counsel's performance was not deficient where he challenged the recommendations made by DCFS and clarified Father's required services under the DCFS service plan. Father's counsel additionally objected to a portion of the dispositional report and the circuit court overruled his objection. Father's counsel cannot be faulted for his decision to question the caseworker instead of refraining to do so and arguing that insufficient evidence was presented for the circuit court to make a determination. The circuit court, on its own motion, could have continued the matter for further reports and evidence to be provided. Father has failed to demonstrate that he received ineffective assistance of counsel.

¶ 70 Father additionally claims that the circuit court's decision was against the manifest weight of the evidence without distinguishing between the adjudicatory and dispositional hearings. Within this argument, Father claims that the circuit court erred by admitting the "entirety of the 2012 juvenile file" and relies on *In re J.G.*, 298 Ill. App. 3d 617, 629 (1998). In *In re J.G.*, the circuit court erred in taking notice of an entire court file; however, the respondent was not prejudiced by the error. *In re J.G.*, 298 Ill. App. 3d at 629. The circuit court's decision was affirmed where there was more than sufficient evidence presented by the State to meet its burden. *In re J.G.*, 298 Ill. App. 3d at 629.

¶ 71 In this case, Father failed to provide any explanation of how he was prejudiced by the circuit court taking judicial notice of a file. Father additionally failed to properly

reference the record in his brief in violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020).

¶ 72 Father additionally argues that the circuit court's decision was against the manifest weight of the evidence regarding K.H., the child receiving care in a long-term care facility in Indiana. For the first time on appeal, Father claims that it was not apparent that the circuit court had jurisdiction regarding K.H.

¶ 73 Section 201(a) of the Uniform Child-Custody Jurisdiction and Enforcement Act (UCCJEA) outlines the circumstances in which "a court of this State has jurisdiction to make an initial child-custody determination." 750 ILCS 36/201(a) (West 2022). "Jurisdiction" under the UCCJEA is "simply a procedural limit on when the court may hear initial custody matters" and does not mean "a precondition to the exercise of the court's inherent authority." (Internal quotation marks omitted.) *In re J.S.*, 2019 IL App (1st) 190059, ¶ 19. "So long as a claim meets the requirements for justiciability, it will be sufficient to invoke the court's subject matter jurisdiction, even if the claim is defectively stated." *McCormick v. Robertson*, 2015 IL 118230, ¶ 23.

¶ 74 Father's claim does not merit this court's consideration. Father, in violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), cites no authority supporting his claim that the court may not have jurisdiction. See *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 31. As a result, Father's claim is forfeited. The circuit court's findings of neglect and its determination of wardship for each of the five children were not against the manifest weight of the evidence.

¶ 75                              III. CONCLUSION

¶ 76    For the foregoing reasons, the judgments of the circuit court of Jackson County, as

to each of the five children, are affirmed.

¶ 77    Affirmed.